NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 221063-U

NO. 4-22-1063

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 26, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Z.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 21JA94 |
| v. | ) | |
| Lamarr S., | ) | Honorable |
| Respondent-Appellant.) | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Lannerd concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, holding the trial court's findings that respondent was unfit in that he failed to make reasonable progress during a nine-month period after the adjudication of neglect and that termination of his parental rights was in the minor's best interest were not against the manifest weight of the evidence.

¶ 2   Respondent, Lamarr S., appeals the trial court's order terminating his parental rights to his son, Z.S. (born March 22, 2021). Respondent argues the court erred in finding the State had proven he was unfit for failing to make reasonable efforts to correct the conditions that led to Z.S.'s removal or reasonable progress toward Z.S.'s return during either of the nine-month periods alleged in the motion for termination of parental rights. Respondent also argues the court erred in finding it was in Z.S.'s best interest to terminate respondent's parental rights. We affirm.

¶ 3                    I. BACKGROUND

¶ 4 On March 25, 2021, the State filed a neglect petition concerning Z.S. The next day, the State filed an amended neglect petition. In the amended petition, respondent was named as the putative father of Z.S., Amber H. was named as Z.S.'s mother, and Laiveil H., Amber's husband at the time of Z.S.'s birth, was named as Z.S.'s father. The amended petition alleged Z.S. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) in that his environment was injurious to his welfare because (1) Amber failed to cure the conditions that brought his sibling into care and (2) Amber had mental health issues that prevented her from properly parenting.

¶ 5 The trial court held a shelter care hearing on March 25, 2021. Respondent attempted to appear at the shelter care hearing by Zoom, but the court refused to let him do so because he had outstanding arrest warrants. During the hearing, the parties indicated that respondent was Z.S.'s biological father, and Laiveil was Z.S.'s legal father due to his status as Amber's husband at the time of Z.S.'s birth. The court ordered DNA testing to confirm respondent was the biological father. After hearing witness testimony, the court found there was probable cause to believe Z.S. had been neglected and awarded temporary custody and guardianship of Z.S. to the Illinois Department of Children and Family Services (DCFS).

¶ 6 On June 16, 2021, an adjudicatory hearing was held. Respondent did not appear at the hearing. On July 16, 2021, the trial court announced its ruling and entered an adjudicatory order, finding the State had proven Z.S. was neglected under both counts alleged in the neglect petition. The court allowed respondent to appear by Zoom when it announced its decision, and the court appointed counsel to represent respondent at that time. The matter proceeded to a dispositional hearing, and the court found the parents unfit, unwilling, or unable to care for Z.S.

The court entered an order making Z.S. a ward of the court, granting guardianship to DCFS, and ordering the parents to cooperate with DCFS and its contracting agencies.

¶ 7 On September 22, 2022, the State filed a motion to terminate respondent's parental rights as to Z.S. pursuant to the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)). The motion alleged respondent was unfit in that he failed to (1) protect Z.S. from conditions within the environment that were injurious to his welfare (*id.* § 1(D)(g)), (2) make reasonable efforts to correct the conditions that were the basis for Z.S.'s removal during a nine-month period after the adjudication of neglect (*id.* § 1(D)(m)(i)), and (3) make reasonable progress toward Z.S.'s return during a nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(ii)). The petition indicated the nine-month periods at issue were from July 16, 2021, to April 16, 2022, and from November 11, 2021, to August 11, 2022. We note the motion stated the second nine-month period ranged from "11/11/22 to 8/11/22." We assume this was a typographical error and that the correct date for the beginning of the nine-month period was November 11, 2021.

¶ 8 The trial court held a fitness hearing on October 4, 2022, and November 2, 2022. At the State's request, the court admitted into evidence several service plans, including plans approved on October 27, 2021, and April 12, 2022. Those service plans listed the following "desired outcomes" for respondent: (1) cooperation with the agency, including completing substance abuse and mental health assessments and (2) achieving "levels of interaction which do not include acts of domestic violence." Respondent's progress as to these desired outcomes was rated unsatisfactory in each of the service plans. The court also admitted documentation showing respondent had a prior conviction for domestic battery in Winnebago County case No. 19-CF-178.

¶ 9	Evidence at the fitness hearing showed respondent was charged with aggravated battery in Winnebago County case No. 20-CF-1851 for an August 2020 incident involving Amber while she was pregnant with Z.S. A warrant for his arrest was issued on September 1, 2020, and he was arrested on July 25, 2021. After his arrest, he was extradited to California for a few weeks. After he was released from custody in California, he returned to Illinois, pled guilty to aggravated battery in Winnebago County case No. 20-CF-1851, and received a sentence of probation. His probation was subsequently revoked. A warrant for his arrest was issued on November 9, 2021, and he was arrested on February 17, 2022. He received a sentence of imprisonment upon the revocation of his probation and was still incarcerated at the time of the fitness hearing.

¶ 10	Samantha Hagerman, an employee of an agency contracted by DCFS to provide case management services, testified she was respondent's caseworker. Hagerman indicated Z.S. came into care in March 2021, and she contacted respondent at the beginning of the case. She completed an integrated assessment with respondent in June 2021, and it was recommended that respondent complete domestic violence services, a substance abuse assessment, and a mental health assessment.

¶ 11	Hagerman testified she had a meeting with respondent and his former attorney on November 22, 2021. At the meeting, they discussed respondent completing a mental health assessment and domestic violence services. They also planned for respondent to complete drug drops and potentially a substance abuse assessment depending on the results of the drops. Respondent failed to complete a mental health assessment or any drug drops before he was taken into custody in February 2022. The agency had domestic violence concerns about respondent due to a report of an incident of domestic violence involving him and Amber in January 2022.

Hagerman testified that her agency did not refer respondent to domestic violence services. The service plan dated April 12, 2022, indicated that the agency was unable to refer respondent to domestic violence services because he failed to sign consents, and Hagerman testified at the fitness hearing that the agency never received consents from respondent. Hagerman believed respondent was referred to domestic violence services through probation before his incarceration in February 2022, though she did not believe he would have been able to complete these services through probation while he had outstanding warrants.

¶ 12 Hagerman testified that, early in the case, the trial court barred respondent from having visitation because he had outstanding warrants. The bar was lifted after the November 2021 meeting, and respondent had visitation with Z.S. approximately once per month at his mother's house. The court again barred visitation in February 2022 because respondent had new outstanding warrants. The second bar on visitation had not been lifted at the time of the fitness hearing, even though respondent no longer had outstanding warrants. If the bar had been lifted, respondent would have possibly been able to have visitation with Z.S. while in prison.

¶ 13 Hagerman stated a paternity test showing definitively that respondent was Z.S.'s father was completed at the end of 2021, and the results were submitted to the trial court in February 2022. Respondent never progressed to unsupervised or overnight visitation due to a lack of progress in services. The agency had concerns about respondent's ability to safely parent due to his involvement in domestic violence. Hagerman indicated that, if respondent was released from prison, he would have to complete a domestic violence course, which takes approximately six months, before he could receive unsupervised visitation. There could be a waitlist for the program, and it could take "upwards to a couple months" to get into the program.

¶ 14    Respondent testified he learned that DNA testing confirmed he was Z.S.'s father in late January or early February 2022. Counsel asked respondent if he participated in services before he learned of the DNA results. Respondent replied: "Well, up until Miss Hagerman made that claim in November that we had a meeting with [my former attorney], I was told that I wasn't allowed to have services because I wasn't the presumed father." Respondent then stated he believed the first time they discussed services was during the meeting with his former attorney and the agency. They discussed respondent participating in a domestic violence class through probation, a parenting class, and a mental health assessment.

¶ 15    Respondent testified that he completed a mental health assessment in May 2022 while he was incarcerated. He was diagnosed with posttraumatic stress disorder and was receiving treatment. Respondent recalled receiving one e-mail from the agency about completing a drug drop before his most recent incarceration, but he did not see it in time to complete the drop. Respondent testified that, while he was on probation, his probation officer referred him to domestic violence classes, but he was never able to participate due to a long waitlist. He also signed up to take a domestic violence class when he was in prison, but a long waitlist prevented him from taking that class as well. Respondent testified he would be released on November 23, 2022, and he planned to take domestic violence classes as soon as possible after his release.

¶ 16    Respondent testified that, when he was out of custody, he had visitation with Z.S. approximately every two weeks during Z.S.'s visits with respondent's mother. He had not requested that the bar on visitation that was currently in place be lifted because he did not know he needed to do so or that it was possible for him to have visitation while incarcerated.

¶ 17    The trial court found the State had not proven respondent was unfit for failing to protect Z.S. from conditions in his environment that were injurious to his welfare. However, the

court found the State had proven by clear and convincing evidence that respondent was unfit in that he failed to make reasonable efforts to correct the conditions that led to Z.S.'s removal or reasonable progress toward Z.S.'s return during the alleged nine-month periods. The court found respondent's efforts and progress were "handicapped by his intermittent incarceration and by outstanding warrants during the course of this case." The court stated the "significant issue in this case with [respondent]" was domestic violence, and the court found respondent had not "satisfactorily completed significant services needed to correct those conditions that led to the removal of the minor."

¶ 18 On November 30, 2022, the matter proceeded to a best interest hearing. The trial court took judicial notice of the fitness proceedings and a best interest report recommending that the parental rights of Z.S.'s parents be terminated. The best interest report indicated Z.S.'s current foster parent had provided everything he needed for approximately the past 10 months, Z.S. knew he was loved by his foster family, and Z.S. was always happy when the caseworker came to the home. The report stated disrupting Z.S.'s current attachments could be detrimental to his future development because he was at a critical age for developing secure attachments. The report indicated Z.S. needed permanency to continue to foster secure attachments and stated that neither of his parents had made progress. Hagerman testified that Z.S. was 18 months old at the time of the hearing and was not verbal.

¶ 19 Respondent testified that Z.S. was attached to him when he had visitation. Respondent stated he was released from custody on November 23, 2022, and was living with his mother. He had signed up for domestic violence classes, mental health services, and substance abuse services through a reentry program. He also indicated he would be drug tested while on parole.

¶ 20    The trial court found the State had proven by a preponderance of the evidence that termination of respondent's parental rights was in Z.S.'s best interest. The court found Z.S. had been in his current placement for approximately 11 months and was well cared for there. The court also noted Z.S.'s current placement was willing to provide permanency. The court found the potential for reunification between Z.S. and his parents was an important consideration but noted respondent was "starting from ground zero." The court stated that even if respondent was successful in completing services, which the court noted was not guaranteed, "it would probably be 9 to 12 months away, given the necessity of services, based on the Court's experience."

¶ 21                                II. ANALYSIS

¶ 22    On appeal, respondent argues the trial court erred in finding he was unfit for failing to make reasonable efforts to correct the conditions that led to Z.S.'s removal or reasonable progress toward Z.S.'s return during either of the nine-month periods alleged in the motion for termination of parental rights. Respondent also argues the court erred in finding termination of his parental rights was in Z.S.'s best interest.

¶ 23                                A. Fitness

¶ 24    Respondent argues the trial court erred in finding he was unfit for failing to make reasonable efforts to correct the conditions that led to Z.S.'s removal or reasonable progress toward Z.S.'s return during either of the nine-month periods at issue. Specifically, respondent argues the State failed to prove he was unfit for failing to make reasonable efforts to correct the conditions that led to Z.S.'s removal because he was not responsible for the conditions that led to Z.S.'s removal and could not cure them. Respondent also argues the court erred in finding him unfit for failing to make reasonable efforts or reasonable progress because the State did not provide him with a nine-month period during which to make efforts or progress. Finally,

respondent argues the State failed to prove by clear and convincing evidence that he failed to make reasonable efforts or reasonable progress during either of the nine-month periods.

¶ 25 Proceedings to terminate parental rights are governed by the Juvenile Court Act and the Adoption Act. Section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2020)) sets forth a two-step process for the involuntary termination of parental rights. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). First, the State must prove by clear and convincing evidence that a parent is unfit based on one or more of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *J.L.*, 236 Ill. 2d at 337. If the trial court finds the parent is unfit, it then determines whether termination of parental rights is in the best interest of the minor. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 352 (2004).

¶ 26 Section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) West 2020)) provides that one ground for unfitness is a parent's failure to "make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." That section further provides that if a service plan has been established and the services were available to the parent, " 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication." *Id.*

¶ 27 " 'Reasonable progress' is an objective standard that is not concerned with a parent's individual efforts and abilities." *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. Reasonable progress exists when the evidence shows "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a

quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). Time spent in prison is included in the nine-month period during which reasonable progress must be made. *J.L.*, 236 Ill. 2d at 343. While the mere fact of incarceration is not evidence of a parent's failure to make reasonable progress, incarceration may impede the parent's progress toward the goal of reunification. *Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21.

¶ 28        Generally, a trial court's finding that a parent is unfit will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. That is, a fitness determination will be reversed "only where the opposite conclusion is clearly apparent." *Id.*

¶ 29        Here, the trial court's determination that respondent was unfit for failing to make reasonable progress toward Z.S.'s return during the nine-month period from November 11, 2021, through August 11, 2022, was not against the manifest weight of the evidence. The evidence at the fitness hearing showed respondent had a significant history of domestic violence that he failed to address by participating in domestic violence services. During most of the nine-month period at issue, respondent was incarcerated for aggravated battery concerning a 2020 incident involving Amber while she was pregnant with Z.S. Hagerman testified there was an additional incident of domestic violence involving respondent and Amber in January 2022, and the evidence showed respondent also had a prior conviction for domestic battery in in Winnebago County case No. 19-CF-178.

¶ 30        Hagerman testified that her agency had concerns about respondent's ability to safely parent due to his history of domestic violence and that completion of domestic violence services would be necessary before respondent could have unsupervised visitation with Z.S.

However, respondent never even began taking domestic violence courses during the nine-month period at issue. While Hagerman testified that her agency had not referred respondent to domestic violence services, the April 2022 service plan indicated the agency was unable to refer him because he had failed to sign consents. Respondent testified he planned to complete domestic violence services through probation prior to his incarceration in February 2022. However, Hagerman stated she did not believe respondent would have been able to do so while he had an outstanding warrant, which he did from the beginning of the nine-month period at issue until his incarceration in February 2022. Respondent testified he signed up for domestic violence classes while in prison but was unable to take the classes due to a waiting list. While respondent was nearing the end of his prison sentence at the time of the fitness hearing and stated he would take domestic violence courses as soon as he could upon release, Hagerman testified the course would take six months and there could be a waiting list for the course.

¶ 31 Accordingly, we conclude it is not clearly apparent that respondent made sufficiently demonstrable progress that the trial court would be able to order Z.S. to return to his custody in the near future. See *L.L.S.*, 218 Ill. App. 3d at 461. While respondent's ability to participate in services during the relevant nine-month period was hindered by his outstanding warrants and subsequent incarceration, the fact that his personal circumstances prevented him from making reasonable progress is irrelevant to the objective standard of reasonable progress. See *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89.

¶ 32 In reaching our holding, we reject respondent's argument that the State failed to provide him with a nine-month period during which to demonstrate reasonable progress. Respondent argues that section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) requires that a parent be given a "9-month period following the adjudication of neglected

or abused minor" in which to show reasonable progress. Respondent contends such a nine-month period may only begin after the parent has at least actual notice of the requirements of the service plan. Respondent contends he was first "formally involved" in the case in February 2022, he provided "un-rebutted" testimony that the first time he discussed services with Hagerman was in February 2022, and there was no evidence to show the October 2021 service plan or any prior service plan was ever served on him.

¶ 33       Initially, respondent has forfeited the argument that he was not given a proper nine-month period during which to demonstrate reasonable progress by failing to raise it in the trial court. See *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41. Respondent contends this argument may be reviewed under the plain error doctrine because the alleged error was so serious that it eroded the integrity of the judicial process. The plain error doctrine permits review of an unpreserved error where a clear or obvious error occurred and either (1) the evidence is closely balanced or (2) the error is so serious that it affected the fairness of the trial or challenged the integrity of the judicial process. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 31. However, "application of the plain error doctrine to civil cases should be exceedingly rare and limited to circumstances amounting to an affront to the judicial process." *Allison v. Stalter*, 251 Ill. App. 3d 127, 131 (1993).

¶ 34       We find respondent has not shown an error occurred in this case. Section 1(D)(m)(ii) of the Adoption Act specifies the time period for measuring reasonable progress is "any 9-month period *following the adjudication of neglected or abused minor.*" (Emphasis added). 750 ILCS 50/1(D)(m)(ii) (West 2020). The statute requires only that the nine-month period follow the adjudication of neglect; it does not include the additional requirement that the parent be given actual notice of the contents of a service plan before the nine-month period may

commence. The only authority respondent cites in support of his argument is the requirement in section 8.2 of the Abused and Neglected Child Reporting Act (325 ILCS 5/8.2 (West 2020)) that DCFS is required to promptly notify families of its responsibility to provide the services identified in a service plan. However, this section has no bearing on whether a nine-month period for demonstrating reasonable progress under section 1(D)(m)(ii) of the Adoption Act may begin before a parent has actual notice of the required services.

¶ 35          Moreover, even if we were to accept respondent's argument that a nine-month period for demonstrating reasonable progress may not commence until after a parent has actual notice of the contents of a service plan, any error in this case would not rise to the level of a "circumstance[ ] amounting to an affront to the judicial process." *Allison*, 251 Ill. App. 3d at 131. The record shows respondent was "formally involved" in the case long before February 2022, as he was named as the putative father in the amended neglect petition, was aware of the trial court proceedings from the beginning of the case, and began participating fully in the court proceedings prior to the dispositional hearing. Hagerman testified at the fitness hearing that she conducted an integrated assessment in June 2021 and that services were recommended as a result. While she did not expressly state she discussed the services with respondent at that time, the court could have inferred she did. In any event, Hagerman testified that she discussed the required services with respondent at a meeting on November 22, 2021. Thus, the record shows respondent had actual notice of the contents of the service plan, at the latest, less than two weeks after the beginning of the nine-month period at issue. This brief delay in advising respondent of the contents of the service plan, even if erroneous, was not an error so serious as to erode the integrity of the judicial process.

¶ 36    Because we have found the trial court did not err in finding respondent unfit for failing to make reasonable progress toward Z.S.'s return during the nine-month period from November 11, 2021 through August 11, 2022, we need not review its finding that respondent was unfit for failing to make reasonable progress during the other nine-month period alleged in the motion for termination of parental rights or for failing to make reasonable efforts to correct the conditions that led to Z.S.'s removal. See *In re C.W.*, 199 Ill. 2d 198, 210 (2002).

¶ 37                                B. Best Interest

¶ 38    Respondent argues the trial court erred in finding termination of his parental rights was in Z.S.'s best interest. Respondent contends his attempts to engage in services show he could be reunified with Z.S. in the near future. He also argues that Z.S. is attached to him and can have permanency with him "as much as any other person."

¶ 39    "At the best-interest portion of a termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this stage, the focus shifts from the parent to the child, and "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. Section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)) provides that the trial court must consider several enumerated factors when making a best interest determination. These factors include, among others, the child's physical safety; "the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative;" the child's need for permanence; and the risks related to substitute care. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006); see also 705 ILCS 405/1-3(4.05) (West 2020).

- 14 -

¶ 40    We will reverse a trial court's best-interest determination only if it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result." *Id.*

¶ 41    Here, the trial court's ruling that termination of parental rights was in Z.S.'s best interest was not against the manifest weight of the evidence. The best interest report indicated Z.S. had been in his current foster home for approximately 10 months (which was over half his life), his foster parent provided for his needs, his foster parent wished to adopt him, and Z.S. was attached to his foster family. The report indicated Z.S. was at a critical stage for developing secure attachments and disrupting his current attachments could be detrimental to his development. Respondent had just been released from prison approximately one week prior to the best interest hearing and would not have been able to take custody of Z.S. in the near future, as he had not yet begun services. Under these circumstances, the facts do not clearly demonstrate the court should have found the State failed to prove by a preponderance of the evidence that termination of respondent's parental rights was in Z.S.'s best interest.

¶ 42                                    III. CONCLUSION

¶ 43    For the reasons stated, we affirm the trial court's judgment.

¶ 44    Affirmed.